# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KENNETH FRIEDMAN, | Case No.: 3:17-cv-00433-MMD-WGC |
| Plaintiff, | **Report & Recommendation of United States Magistrate Judge** |
| v. | Re: ECF No. 171 |
| ROMEO ARANAS, et al., | |
| Defendants. | |

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Plaintiff's Motion for Partial Summary Judgment on the Involuntary Transfer. (ECF No. 171.) Defendants filed a response. (ECF Nos. 189, 189-1 to 189-8.)

After a thorough review, it is recommended that Plaintiff's motion be denied as Defendants have raised a genuine dispute of material fact as to Plaintiff's retaliatory transfer claims sufficient to defeat his motion for summary judgment.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. The events giving rise to this

action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC).

(*Id.*) Defendants are NDOC's Medical Director (former) Romeo Aranas; NNCC Caseworker

Shelly Conlin, NNCC Staff Psychologist Bradley Kyle, NNCC Staff Psychologist, NNCC Social

Worker William Pence, NNCC psyche nurse Danielle Richards, NNCC Associate Warden Lisa

Walsh, (former) NNCC Psychologist Lauren Wing, and NNCC Psychologist Nathaniel Woods.[1]

The court screened Plaintiff's second amended complaint (SAC) (ECF No. 100), and allowed Plaintiff to proceed with the following claims:  (1) an Eighth Amendment deliberate indifference to serious medical needs claim against Woods, Kyle, and Aranas based on allegations that they deprived him of adequate psychotherapy, counseling and rehabilitation in contravention of prior orders and treatment received from various mental health service providers; (2) a Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1(a) claim against Woods, Kyle, and Aranas based on allegations they would not allow him to obtain therapy unless he cut his hair and beard in violation of tenets of his Orthodox Jewish faith; (3) a retaliation claim against Richards, Woods, and Kyle based on allegations that disciplinary charges were filed against him in retribution for filing grievances and lawsuits; (4) an Eighth Amendment deliberate indifference to serious medical needs claim against Kyle, Woods, Pence and Wing based on allegations they engaged in knowing misdiagnoses so Plaintiff would not receive treatment for his post-traumatic stress disorder (PTSD); (5) Eighth Amendment and retaliation claims against Woods, Kyle, Pence and Richards based on allegations they restricted him to seeing only non-female mental health staff  because of his protected conduct which resulted in his access to mental health care being severely constrained; and (6) retaliation claims against Walsh and Conlin based

---

[1] Defendant Keith Ownsby was dismissed without prejudice under Federal Rule of Civil Procedure 4(m). (ECF No. 103.)

on: (a) allegations they contrived a false classification score to lock Plaintiff up in administrative segregation after he refused to settle his case at mediation and threatened him with a punitive transfer to Ely State Prison (ESP) ESP, and (b) allegations that he received a retaliatory transfer to Southern Desert Correctional Center (SDCC), which his classification notes precluded, on the basis of a false pretext of anonymous threatening kites against him which were not properly investigated. (*See* ECF No. 83.)

Only the retaliation claims against Walsh and Conlin are the subject of Plaintiff's motion.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must

prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W.*

*Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

Preliminarily, the court will address Defendants' argument that Plaintiff's motion should be denied because it does not cite any authority in support of his propositions. Defendants mistakenly rely on an old version of a Local Rule to support their argument. A previous version of Local Rule 7-2 provided that the failure to file points and authorities in support of a motion constitutes consent to denial of the motion. The current version of Local Rule 7-2 states that a motion must be supported by a memorandum of points and authorities, but omits the statement that a failure to do so constitutes consent to denial of the motion. While Plaintiff did not cite authorities in support of his motion, the court realizes Plaintiff is an inmate proceeding pro se in this action and will exercise its discretion and nevertheless consider his motion since it does include his statement of facts, and because the applicable retaliation authority is frequently utilized and well known to the court. Therefore, Plaintiff's motion should not be denied on this basis alone.

To reiterate, there are two separate incidents where Plaintiff alleges Walsh and Conlin retaliated against him: (1) by contriving a false classification score to lock Plaintiff up in administrative segregation after he refused to settle this case at mediation, and threatening him with a punitive transfer to ESP; and (2) a retaliatory transfer to SDCC, which he claims his classification notes precluded, on the basis of the false pretext of receiving threatening kites against

him, which he contends were not even investigated. The court will first set forth the retaliation

legal standard, and then address each of Plaintiff's retaliation claims.

**A. Retaliation**

"Section 1983 provides a cause of action for prison inmates whose constitutionally

protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d

1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim

consists of five elements:

> (1) An assertion that a state actor took some adverse action against
> an inmate (2) because of (3) that prisoner's protected conduct, and
> that such action (4) chilled the inmate's exercise of his First
> Amendment rights, and (5) the action did not reasonably advance a
> legitimate correctional goal.

*Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)).

"The most fundamental of the constitutional protections that prisoners retain are the First

Amendment rights to file prison grievances and to pursue civil rights litigation in the courts for

'[w]ithout those bedrock constitutional guarantees, inmates would be left with no viable

mechanism to remedy prison injustices.'" *Entler v. Gregoire,* 872 F.3d 1031, 1039 (9th Cir. 2017)

(quoting *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005)).

**B. Administrative Lock Up and Alleged Threats of Punitive Transfer to ESP**

As to the first incident, Plaintiff maintains that he had rejected various settlement offers,

and then Walsh, approximately 24 hours before the mediation in this case, issued the

administrative segregation lock up order. He asserts that Walsh wrongfully acted on an improper

classification risk factor score (RFS) in asserting Plaintiff should not be allowed in NNCC, a

medium custody facility, and instead should be transferred to ESP. After the mediation, Walsh

released Plaintiff back to medium custody at NNCC. Before she released him, Plaintiff claims that

she took the opportunity to discuss numerous grievances Plaintiff had filed at NNCC. (Pl. Aff., ECF No. 171 at 75.)[2]

Plaintiff argues that Walsh and Conlin retaliated against him as a result of his civil rights action and grievance activity. Plaintiff presents Walsh's and Conlin's responses to requests for admission (RFA) he propounded as evidence in support of his motion.

Defendants present Plaintiff's case notes from July 18, 2018, indicating that Plaintiff was previously approved to transfer to ESP, but his points dropped to medium, so it was recommended he stay at NNCC general population. Walsh updated the case note on July 24, 2018, stating that Plaintiff was placed in administrative segregation due to approval by OMD for ESP. Then, Caseworker Alishio contacted Plaintiff and advised that during his due process, he reviewed his RFS and had since decreased to medium custody. Walsh met with Plaintiff due to a meeting that was scheduled with Plaintiff, Walsh and the Chaplain. Walsh advised Plaintiff that he and a few other Jewish inmates were involved in a power struggle that was brought to her attention by the Chaplain. He denied this, and Walsh noted that Plaintiff continued to insult the facilitator, and it appeared Plaintiff and a few others did not care for the facilitator. Plaintiff was warned that an attempt to undermine the Chaplain could result in a transfer to a different facility. (ECF No. 189-4 at 2; Walsh Decl., ECF No. 189-5 ¶¶ 8-9.)

In her responses to Plaintiff's RFAs, Conlin admits she was involved in the April 2, 2018 calculation of Plaintiff's RFS score, and appears to admit that Plaintiff's RFS score was improperly calculated. (ECF No. 171 at 18-19, 28-29, response to RFA Nos. 3-5, 28-34.) There is no evidence, however, that Conlin intentionally miscalculated Plaintiff's RFS score to have him transferred to ESP because of his grievances or litigation. Both Conlin and Walsh specifically deny knowing

---

[2] In his affidavit, Plaintiff swears to the truth of the statements made in his motion.

about Plaintiff's grievances or litigation at this time. (ECF No. 171 at 21-22, response to RFA No. 11; ECF No. 171 at 48-51, response to RFA Nos. 5, 6, 9-12.) While Walsh was the grievance *coordinator*, she had no direct involvement in responding to grievances. (ECF No. 171 at 49, response to RFA No. 8.)

In addition, while Plaintiff claims that Walsh had him locked up in administrative segregation due to his improper RFS score because of his litigation, failure to settle this action and grievances, the evidence simply does not support this. There is no evidence Walsh was involved in the calculation of the RFS score. In addition, Walsh specifically denies knowing about Plaintiff's litigation, grievances, or rejection of settlement offers at that time. (ECF No. 171 at 48-51, 58, response to RFA Nos. 5, 6, 9-12, 38.) She also explicitly denies that she ever told Plaintiff to cease his grievances or he would face an adverse, involuntary transfer from NNCC. (ECF No. 171 at 59-60, response to RFA Nos. 41, 42.) Instead, she contends she met with Plaintiff over an apparent power struggle within the Jewish community at NNCC, and warned him that he may have to be transferred if he continued to undermine the chaplain. Moreover, the evidence reflects that OMD initially notified Walsh that Plaintiff's RFS score was high and he would be sent to ESP, but then she was notified that his RFS score had dropped and she recommended he stay at NNCC.

There are genuinely disputed facts that preclude the entry of summary judgment in Plaintiff's favor on this retaliation claim.

## C. Alleged Retaliatory Transfer to SDCC

In his motion, Plaintiff alleges that he reported the activities (of Walsh and Conlin) by including these allegations against doe defendants in his supplemental complaint. He asserts that electronic filings are routinely given to Walsh's co-workers and subordinates in the NNCC library, and it was public records that doe defendants were being accused of retaliation. By September 12,

2018, Walsh and Conlin had Plaintiff back in administrative segregation lock down pending a transfer to SDCC, claiming it was for his protection. Plaintiff asserts he had long been flagged to never be transferred to SDCC due to his history, citing a March 14, 2014 classification note. (ECF No. 171 at 13.) Plaintiff was in fact transferred to SDCC. Plaintiff's position is that his administrative segregation lock up at NNCC and transfer to SDCC were based on a contrived story by Walsh and Conlin that NNCC staff had received two anonymous kites or letters claiming Plaintiff was in danger.

Plaintiff asserts that he has no known listed enemies at NNCC, and Defendants have not identified the persons responsible for the kites. In addition, he contends that prison staff, including Walsh or Conlin, could have just as easily accessed the prison mailbox system to drop the anonymous kites in the mail to get Plaintiff locked up. In addition, he says that prisoners often submit hoax kites for fun, or to get staff to unjustifiably lock up another inmate. He further states that NDOC staff allow prisoners to sign waivers for "protection" in such instances, but Conlin and Walsh did not offer a waiver to Plaintiff. Walsh did not even allow an investigation into the threats before Plaintiff was transferred. He also points out that he had no restrictions on going to other medium custody facilities, such as Warm Springs Correctional Center (WSCC) or Lovelock Correctional Center (LCC). (Pl. Aff., ECF No. 171 at 75.)

Again, Plaintiff cites Walsh's and Conlin's responses to RFAs as supportive of his position.

Conlin denies that she had communications with Walsh regarding Plaintiff's lock up in administrative segregation in September of 2018. (ECF No. 171 at 35, response to RFA No. 48.)

Conlin admits that within five days of Walsh's notice that Plaintiff would be placed in administrative segregation at NNCC, Conlin composed a classification/due process case note indicating Plaintiff was pending transfer on September 12, 2018. (ECF No. 171 at 36, response to

RFA No. 51.) Conlin admits Plaintiff was not given the option to waive protective segregation. (ECF No. 171 at 42, response to FA No. 67.) Conlin also acknowledges that anonymous kites may be composed by inmates and staff. (ECF No. 171 at 42-43, response to RFA No. 68.)

Walsh admits that she ordered an administrative segregation notice for Plaintiff on September 12, 2018. (ECF No. 171 at 63, response to RFA No. 50.) Walsh admits that this administrative segregation notice was based on the receipt of two kites threatening Plaintiff. (ECF No. 171 at 64. Response to RFA No. 53.) She also admits Plaintiff was not presented with these two alleged kites or with the wording of the kites. (ECF No. 171 at 64-65, response to RFA Nos. 54, 57.) She acknowledges that inmates as well as staff have access to the institutional kites and mailboxes used to mail kites; that inmates sometimes use anonymous kites to alleged invalid threats to get another inmate locked up. (ECF No. 171 at 65-67, response to RFA Nos. 58, 59, 65.) Walsh admits she did not require the Inspector General's Office or NNCC Institutional Investigator to investigate the kites as to credibility or authorship. (ECF No. 171 at 66, response to RFA No. 61.) Like Conlin, Walsh admits Plaintiff was not given an opportunity to waive protection of administrative segregation lock up or transfer, and that other inmates subject to administrative lock up due to anonymous threatening kites were allowed to return to the general population yard after signing a waiver. (ECF No. 171 at 67, 69, response to RFA Nos. 63, 69.)

Walsh states that at her July 24, 2018 meeting with Plaintiff, Plaintiff was warned that if his conduct relating to the religious community, the facilitator and Chaplin did not change, it might be necessary to transfer him. Following that meeting, she interviewed the inmates involved in the so-called "power struggle" related to the Jewish facilitator at NNCC, and they advised her that they did not like Plaintiff or the manner in which he was treating the facilitator. (Walsh Decl., ECF No. 189-5 ¶¶ 10, 15.) Kites were subsequently received threatening Plaintiff's safety, and Walsh

believes they may be related to this issue. (*Id.* ¶ 11.) She states that since Plaintiff had been warned about his conduct, the decision was made to transfer him to SDCC. (*Id.* ¶ 12.) Walsh acknowledges there was a notation in his case notes (stating he should not be housed at SDCC), but she points out that the notation is quite old, and situations at each facility can change over time, and a prior notation is not considered a permanent prohibition for housing at a particular facility. The case note was from March 14, 2014. (ECF No. 189-7 at 2.) It stated: "Inmate can not safely be housed in GP at HDSP or SDCC due to his offense. He can no longer be housed in PSO (presumably protective segregation) due to CMS issues there…"

A case note from September 12, 2018, states that Plaintiff was seen for his administrative segregation due process hearing before Conlin and Correctional Officer Watkins (not a party). It notes that Plaintiff was brought into administrative segregation for protective purposes after staff received kites threatening him. Plaintiff stated "he ha[d] a feeling who [was] behind this." He believed [that person] was upset after Plaintiff stopped his income on the yard. Plaintiff was advised that he would be in administrative segregation pending transfer, and Plaintiff indicated he would not have any problem housing on another yard. (ECF No. 189-6 at 2.)

Conlin included a case note on September 18, 2018, that Plaintiff was brought into administrative segregation for protective purposes after staff received kites threatening his safety, and indicated that as a result it would be best to transfer him to another institution. SDCC medium general population custody was requested. (ECF No. 189-6 at 2.)

///

///

///

1  Plaintiff must demonstrate that he was locked in administrative segregation and then
2  transferred to SDCC because of his protected conduct. He asserts that these measures were taken
3  because Walsh and Conlin knew he had supplemented his complaint concerning their conduct.

4  Walsh and Conlin deny knowing about his litigation or grievances. Moreover, Plaintiff
5  acknowledges that when he supplemented his lawsuit, the allegations were initially as to doe
6  defendants who were not identified. Plaintiff presents no evidence that Walsh and Conlin actually
7  knew about his litigation or grievances.

8  Moreover, while Plaintiff claims the anonymous threatening kites were just a pretext for
9  his transfer, this is based merely on his speculation, and no evidence. On the other hand, Walsh
10  presents evidence that this was the case, and there was an additional reason for his transfer: his
11  failure to cease in the undermining conduct relative to the chaplain and Jewish community at
12  NNCC which he had previously been warned may subject him to a transfer. There is at the very
13  least a genuine dispute of material fact as to this retaliation claim. Therefore, summary judgment
14  should not be granted in Plaintiff's favor as to this claim.

15  **IV. RECOMMENDATION**

16  IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING**
17  Plaintiff's Motion for Partial Summary Judgment (ECF No. 171).

18  The parties should be aware of the following:

19  1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to
20  this Report and Recommendation within fourteen days of being served with a copy of the Report
21  and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report
22  and Recommendation" and should be accompanied by points and authorities for consideration by
23  the district judge.

1        2. That this Report and Recommendation is not an appealable order and that any notice of

2   appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

3   until entry of judgment by the district court.

4        Dated: December 18, 2019.

5                                          _William G. Cobb_____

6                                          William G. Cobb
                                           United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23